# 15-3117-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

TRAVELERS INDEMNITY COMPANY, TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, FKA Travelers Indemnity Company
of Rhode Island,

*Plaintiffs-Counter-Defendants-Appellees,*

TRAVELERS CASUALTY AND SURETY COMPANY,
FKA The Aetna Casualty and Surety Company,

*Plaintiff-Counter-Defendant,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED PAGE PROOF BRIEF FOR
## DEFENDANT-CROSS-DEFENDANT-APPELLEE

SHANE R. HESKIN
ROBERT F. WALSH
WHITE AND WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, Pennsylvania 19103
(215) 864-7000

JONATHAN D. HACKER
BRADLEY N. GARCIA
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Defendant-Cross-Defendant-Appellee*

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,
FKA Travelers Indemnity Company of Illinois,

*Plaintiff,*

– v. –

NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS CORPORATION,

*Defendants-Cross-Claimants-Counter-Claimants-Appellants,*

CENTURY INDEMNITY COMPANY, eventual successor in interest
to Insurance Company of North America,

*Defendant-Cross-Defendant-Appellee.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Nominal-Defendant-Appellee and Cross-Defendant-Appellee Century Indemnity Company ("Century") states that it is a wholly-owned subsidiary of Brandywine Holdings Corporation, which in turn is a wholly-owned subsidiary of INA Financial Corporation, which in turn is a wholly-owned subsidiary of INA Corporation, which is a wholly-owned subsidiary of ACE INA Holdings, Inc., 80% of which is owned by ACE Group Holdings, Inc. and 20% of which is owned by Chubb Limited. ACE Group Holdings, Inc. is a wholly-owned subsidiary of Chubb Limited. Chubb Limited is the ultimate parent and the only publicly traded company.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

QUESTIONS PRESENTED .....................................................................3

COUNTERSTATEMENT OF THE CASE.................................................4

    A.    The Century Policies .................................................................5

    B.    Factual Background...................................................................6

        1.    The Bethpage Facility .................................................6

            a.    Grumman's Operations...................................6

            b.    Grumman's Knowledge Of TCE Pollution At The Bethpage Facility ...........................................8

            c.    The 1983 PRP Letter And Grumman's Purported Notice..........................................................12

            d.    NYSDEC's 1986 Site-Wide Investigation For TCE And Other Chemicals ....................................13

        2.    The Bethpage Community Park............................15

        3.    The Water Board District Sites .............................17

    C.    Proceedings Below ...........................................................19

SUMMARY OF THE ARGUMENT ........................................................21

STANDARD OF REVIEW ....................................................................24

ARGUMENT .......................................................................................25

I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO CENTURY ON THE BETHPAGE FACILITY CLAIM BECAUSE GRUMMAN FAILED TO GIVE TIMELY NOTICE OF BOTH THE OCCURRENCE AND THE CLAIM ...............25

    A.    Grumman's Obligation To Give Notice Of TCE Contamination At The Facility Accrued In The 1970s............................................25

        1.    Grumman Has Produced No Evidence That It Actually Believed In The 1970s That It Could Not Be Held Liable For TCE Contamination At The Bethpage Facility ................28

# TABLE OF CONTENTS
## (continued)

**Page**

    2.    If Grumman Did Believe In The 1970s That It Would Never Be Liable For TCE Contamination At The Facility, That Belief Was Unreasonable .................................29

        a.    Grumman Knew It Had Caused TCE Contamination...............................................30

        b.    Grumman's Contrary Arguments Are Meritless ..........34

B.    The District Court Correctly Held That The 1984 Travelers Old Bethpage Landfill Update Package Did Not Satisfy Grumman's Prompt-Notice Obligation ................................................40

    1.    The 1984 Package Did Not Provide Separate Notice To Century As To The Policies Under Which Coverage Was Sought ...............................................................40

    2.    The 1984 Old Bethpage Landfill Update Package Did Not Relate To The Occurrence For Which Grumman Seeks Coverage .....................................................43

    3.    The 1984 Old Bethpage Landfill Update Package Did Not Include All "Reasonably Obtainable Information" Related To Contamination At The Facility.............................45

C.    Grumman's Notice Of The NYSDEC Claim Was Untimely As A Matter Of Law ................................................................46

D.    Century Did Not Waive Its Notice Defenses As To The Bethpage Facility.................................................................48

    1.    Century Did Not Waive Late Notice As To The NYSDEC Facility Claim Through Its Disclaimer On The Old Bethpage Landfill Claim...................................49

    2.    Century Did Not Waive Late Notice Through The Mere Passage Of Time ................................................51

II.    THE DISTRICT COURT CORRECTLY GRANTED CENTURY SUMMARY JUDGMENT AS TO THE PARK-RELATED COSTS........53

A.    Grumman Failed To Give Timely Notice Of The Accident Or Occurrence At The Park, Which Was Known To Grumman By At Least 2002 ...............................................................54

# TABLE OF CONTENTS
## (continued)

**Page**

B. Grumman's Notice Of Oyster Bay's Suit Was Unreasonably Late As A Matter of Law ...................................................................57

C. Century Did Not Waive Its Late Notice Defense With Respect To Oyster Bay's Claim.......................................................................57

III. THE DISTRICT COURT CORRECTLY HELD THAT THERE IS NO COVERAGE FOR THE WATER DISTRICT CLAIMS ....................58

CONCLUSION ....................................................................................61

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allstate Ins. Co. v. Gross*,
27 N.Y.2d 263 (1970) .........................................................................52

*Allstate Ins. Co. v. Moon*,
89 A.D.2d 804 (4th Dep't 1982).........................................................43

*Am. Home Assurance Co. v. Int'l Ins. Co.*,
90 N.Y.2d 433 (1997) .........................................................................48

*Am. Home Assurance Co. v. Republic Ins. Co.*,
984 F.2d 76 (2d Cir. 1993) .................................................................47

*Am. Ins. Co. v. Fairchild Indus., Inc.*,
56 F.3d 435 (2d Cir. 1995) .................................................25, 56, 60

*Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*,
189 F.3d 208 (2d Cir. 1999) ...............................................................60

*Briggs Ave., LLC v. Ins. Corp. of Hannover*,
11 N.Y.3d 377 (2008) .........................................................................48

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*,
302 F.3d 83 (2d Cir. 2002) .................................................................52

*Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*,
979 F.2d 268 (2d Cir. 1992) ...........................................26, 27, 28, 38

*Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*,
98 N.Y.2d 208 (2002) .........................................................................39

*Dembitzer v. Gilliam*,
44 Misc. 2d 487 (Sup. Ct. 1964).........................................................43

*Fairmont Funding, Ltd. v. Utica Mut. Ins. Co.*,
694 N.Y.S.2d 389 (1st Dep't 1999)....................................................51

*Gilbert Frank Corp. v. Fed. Ins. Co.*,
70 N.Y.2d 966 (1988) .........................................................................48

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Green Door Realty Corp. v. TIG Ins. Co.*,
  329 F.3d 282 (2d Cir. 2003) .........................................................26, 27

*HDI-Gerling Am. Ins. Co. v. Liberty Mut. Ins. Co.*,
  2013 U.S. Dist. LEXIS 125023 (W.D.N.Y. July 16, 2013) ..............................42

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) .............................................................24

*Indian Harbor Ins. Co. v. City of San Diego*,
  586 F. App'x 726 (2d Cir. 2014) .......................................................46

*Keyspan Gas East Corp. v. Munich Reinsurance America, Inc.*,
  23 N.Y.3d 583 (2014).........................................................51, 52, 53

*KeySpan*, *Long Island Lighting Co. v. Am. Re-Ins. Co.*,
  998 N.Y.S.2d 169 (1st Dep't 2014)...........................................52, 53

*Lindsay Mfg. Co. v. Hartford Accident & Indem. Co.*,
  118 F.3d 1263 (8th Cir. 1997) .......................................................56

*Long Island Lighting Co. v. Allianz Underwriters Ins. Co.*,
  805 N.Y.S.2d 74 (1st Dep't 2005)........................................27, 29, 39

*Luria Bros. & Co. v. All. Assurance Co.*,
  780 F.2d 1082 (2d Cir. 1986) .......................................................49, 50

*Metro. Transit Auth. v. Tutor Perini Corp.*,
  564 F. App'x 618 (2d Cir. 2014) ....................................................47

*Minasian v. IDS Property Cas. Ins. Co.*,
  2015 WL 8485257 (S.D.N.Y. Dec. 9, 2015).......................................42

*Miranda v. Aetna Cas. & Sur. Co.*,
  51 A.D.2d 1035 (2d Dep't 1976)....................................................43

*New York v. Amro Realty Corp.*,
  936 F.2d 1420 (2d Cir. 1991) .......................................................45

## TABLE OF AUTHORITIES
### (continued)

Page

*Phila. Indem. Ins. Co. v. Genesee Valley Improvement Corp.*,
  41 A.D.3d 44 (4th Dep't 2007) .......................................................................... 27

*Prof'l Staff Congress-City Univ. of N.Y. v. N.Y. State Pub. Emp't
  Relations Bd.*,
  7 N.Y.3d 458 (2006) .......................................................................................... 48

*Reynolds Metal Co. v. Aetna Casualty & Surety Co.*,
  696 N.Y.S.2d 563 (3d Dep't 1999) ............................................................... 55, 56

*Rockland Exposition, Inc. v. Great Am. Assurance Co.*,
  746 F. Supp. 2d 528 (S.D.N.Y. 2010), *aff'd* 445 F. App'x 387 (2d
  Cir. 2011) .......................................................................................................... 28

*Sorbara Constr. Corp. v. AIU Ins. Co.*,
  11 N.Y.3d 805 (2008) ............................................................... 40, 41, 42, 45

*Sparacino* v. *Pawtucket Mut. Ins. Co.*,
  50 F.3d 141 (2d Cir. 1995) ................................................................................ 26

*SSBSS Realty Corp. v. Pub. Serv. Mut. Ins. Co.*,
  253 A.D.2d 583 (1st Dep't 1998) ....................................................................... 26

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*,
  73 F.3d 1178 (2d Cir. 1995) .............................................................................. 39

*U.S. Underwriters Ins. Co. v. Landau*,
  2010 WL 2517196 (E.D.N.Y. June 9, 2010) ..................................................... 42

*United States v. Alcanin Aluminum Corp.*,
  990 F.2d 711 (2d Cir. 1993) .............................................................................. 38

*White v. City of N.Y.*,
  81 N.Y.2d 955 (1993) ........................................................................................ 26

*Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co.*,
  146 F.3d 131 (2d Cir. 1998) .............................................................................. 60

vi

# INTRODUCTION

Appellant Northrop Grumman Corporation ("Grumman") seeks insurance coverage for liabilities arising from environmental contamination it caused at a former manufacturing facility in Bethpage, New York ("Bethpage Facility" or "Facility"), at the Bethpage Community Park ("Park"), and at wells administered by three nearby water districts ("Water Districts"). Under standard commercial general liability ("CGL") policies and longstanding New York law, an insured cannot obtain coverage for claims arising from covered occurrences unless it provides timely notice to its insurer of both the occurrence and the claim. New York precedents addressing the permissible time period for notice generally speak in terms of days or weeks. In this case, however, Grumman waited *years*, even *decades*, to provide notice to appellee Century Indemnity Company ("Century") of the claims and occurrences at the foregoing sites. As the district court easily concluded, Grumman's unreasonable and inexcusable delay precluded its claims for coverage.

As for the Bethpage Facility, Grumman knew by the late 1970s that it was responsible for substantial discharges of cancer-causing trichloroethylene ("TCE") into the soil and groundwater around the Facility. Grumman, however, did not provide notice of that occurrence for years, by Grumman's own account, or for decades, as the district court saw it. Either way, notice was grossly late. Grumman

1

argues that it was not required to provide notice when it became aware of the

contamination because Grumman could reasonably have believed it would avoid

liability.  To excuse a failure to provide notice on that basis, however, Grumman

was required to prove that it *actually made a deliberate determination* that it would

be immune from liability and declined to give notice for that reason.  Grumman

adduced no such evidence.  Further, the evidence Grumman does cite to establish

the reasonableness of such a hypothetical determination reflects only the facts

known to outside third parties—Grumman does not even attempt to show that an

insured *knowing everything Grumman knew* would reasonably have concluded that

notice of its TCE discharges was unnecessary.

Grumman's argument for coverage of claims arising from its contamination

of the Park is equally meritless.  Grumman became aware in 2001 and 2002 that it

had contaminated the Park's soil, but it said nothing to Century until 2005.

Grumman does not even purport to excuse that delay, arguing instead that it

provided notice through a letter about a different lawsuit and site sent in 1984,

almost two decades before Grumman even became aware of the occurrence at the

Park itself.  Grumman cannot explain how that letter could have given notice of an

occurrence Grumman was not even aware of.

Finally, the Water Districts in 2001 and 2002 asserted claims against

Grumman, charging Grumman with polluting their wells and demanding payment

for legally required remediation costs. Grumman, however, did not provide notice of those claims to Century until at least 2009. Grumman says the Water Districts' demands did not constitute "claims" for which notice was required because the Water Districts were then participating in an ongoing state administrative action, but what matters is that the Water Districts were asserting their *own* rights and seeking their *own* recovery, which suffices to establish a claim.

For each of the foregoing claims, Grumman unambiguously breached its contractual obligation to provide timely notice to Century before seeking coverage. The order granting summary judgment to Century should be affirmed.

## JURISDICTIONAL STATEMENT

Grumman's jurisdictional statement is correct.

## QUESTIONS PRESENTED

1. Whether Grumman failed to satisfy the Century policies' prompt notice requirement by waiting until 1984 (at the earliest) to provide notice of contamination at the Bethpage Facility, when Grumman indisputably knew of that contamination by the late 1970s and has no valid excuse for this delay.

2. Whether Grumman provided effective notice of contamination at the Bethpage Facility when it copied Century on a package of materials that concerned different contamination at a different location and failed to identify any of the Century policies under which coverage was sought.

3.   Whether Grumman's unexcused seven-week delay in providing Century that package of materials violated the Century policies' prompt notice-of-claim requirement.

4.   Whether Century can be held to have waived reliance on its policies' notice provisions simply as a result of the passage of time.

5.   Whether Grumman provided notice in 1984 of an occurrence at the Community Park that Grumman did not become aware of until 2002.

6.   Whether the Water Districts asserted "claims" against Grumman when they demanded that Grumman pay costs required to remediate their water supplies.

## COUNTERSTATEMENT OF THE CASE

Century issued primary and excess CGL policies to Grumman between 1951 and 1968.  Beginning in the 1930s and through the 1990s, Grumman disposed into the ground certain toxic chemicals at separate sites in and around Bethpage, New York.  Grumman was subsequently required by state and federal regulators to remediate the damage it caused through those disposal practices.  Grumman seeks coverage under the Century policies for those remediation costs.

Each Century policy covers liability from property damage caused by an accident or occurrence.  Each policy also requires as a precondition of coverage that Grumman provide Century prompt notice of such accident or occurrence, and prompt or immediate notice of any claim brought against Grumman.  In four

4

separate rulings, the district court (Forrest, J.) denied Grumman's coverage claims because Grumman failed to satisfy its policies' notice requirements.

### A. The Century Policies

Century issued primary CGL policies to Grumman covering 1951 to 1962, and excess policies covering 1951 to 1968. SA__ [DE554_2]. Those policies provide coverage for liability resulting from property damage caused by an accident or occurrence. *E.g.*, JA__[DE239_Walsh_Ex.1_005); JA__[DE239_Walsh_Ex.8_664).

Each policy requires, as a precondition of coverage, that Grumman provide Century prompt notice of an accident or occurrence, and immediate notice of any claim against it. The primary policies require that "[w]hen an accident occurs," Grumman must provide Century "written notice … as soon as practicable." SA__[DE554_3]. The policies also prescribe the content of such notice: "Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses." *Id.* The primary policies impose an even stricter timing requirement for notice when an actual claim is made: "If claim is made or suit is brought against" Grumman, it "shall immediately forward to [Century] every demand, notice, summons or other process received by him or his representative." *Id.*

5

The excess policies similarly require "written" notice of an accident or occurrence to be given "as soon as practicable" upon "the happening of an occurrence or accident that appears reasonably likely to involve" the policies. *Id.* Such notice must include "particulars sufficient to identify the insured and also the fullest information obtainable at the time." JA__[DE239_Walsh_Ex.8_670]. The excess policies' notice-of-claim provisions require Grumman to "give like notice, with full particulars, of any claim on account of such occurrence." *Id.*

### B. Factual Background

Grumman seeks coverage for remediation of soil and groundwater contamination Grumman caused at several different sites in the Bethpage area: the Bethpage Facility, the Bethpage Community Park, and the water supplies of the three Water Districts.

#### 1. *The Bethpage Facility*

##### a. *Grumman's Operations*

The Bethpage Facility was located on approximately 600 acres in Bethpage, New York. The original plant opened in the late 1930s and was used in conjunction with the U.S. Navy to develop and manufacture aircraft and other advanced machinery. Appellant's Opening Br. ("AOB") 5.

By the early 1940s, Grumman began using TCE to clean and degrease parts at the Facility. SA__[DE552_3]. Grumman stored TCE in numerous tanks, pits,

and stills throughout the Facility. *Id.* Grumman employees would, for example, transfer TCE from the storage tanks to numerous "degreasers," where the TCE would clean large metal parts, and then return it to the tanks.

JA__[DE421_56.1]_¶¶214, 319. These routine operations used ███████████

██████████ JA__[DE436_56.1]_¶6. By contrast, Grumman's next-door neighbor at the time, Hooker Chemical & Plastics Corporation ("Hooker"), only used approximately ████████ of TCE per year, most of which was consumed in their production processes. JA__[DE388_Heskin_Ex.28_368-69]; JA__[DE436_56.1]_¶6. Grumman admits that, by the late 1970s, TCE was a known pollutant and cancer-causing agent. JA__[DE421_56.1]_¶222; JA__[DE436_56.1]_¶30.

Grumman also drew significant quantities of water from the ground to use for rinsing manufactured parts and cleaning work areas, which "directly exposed" the water "to chemicals used in" Grumman's production processes. JA__[DE80_Heskin_Ex.6_541]. Grumman directed its wastewaters into "recharge basins," i.e., unlined pits designed to allow water to slowly percolate through the soil and return to the groundwater. JA__[DE80_Heskin_Ex.7_096]. ████████

████████████████████████████████████████

████████████████████████████████

JA__[DE80_Heskin_Ex.7_096, 098].

7

Grumman also used sludge drying beds—holes in the ground designed to dry out waste sludge generated at the Facility before being deposited off-site. JA__[DE80_Heskin_Ex.6_541]. ████████████████████ ████████████████████████████████████████████ From at least 1966 to 1977, Grumman sent hazardous-waste sludge from the sludge drying beds to the Old Bethpage Landfill ("Landfill"). JA__[DE388_Heskin_Ex.30_903]; JA__[DE359_Cannella_Ex.19_711]. The Landfill is located nearly three miles to the east of the Facility. JA__[DE436_Calland_Ex.183]. On December 9, 1983, the State of New York sued Grumman in federal court for its role in contaminating the Old Bethpage Landfill. JA__[DE359_Cannella_Ex.19_703-05].

b.   *Grumman's Knowledge Of TCE Pollution At The Bethpage Facility*

In 1975, testing revealed that TCE and other chemicals used in Grumman's processes were present in the groundwater at and around the Facility. JA__[DE388_Heskin_Ex.16_195]. In November 1976, multiple newspaper articles reported that wells on Grumman's property had to be shut down due to contamination by cancer-causing agents. JA__[DE388_Heskin Ex.18_097, 104]; *see* SA__[DE554_5] (by 1976, Grumman had "a number of news articles in its files that referred to groundwater contamination at the Bethpage Facility, linked it to Grumman, and discussed remediation efforts"). Several state and federal

agencies were alerted to these contamination problems.

JA__[DE388_Heskin_Ex.43_405, 418, 457, 463].

Most important here, overwhelming undisputed evidence from the mid-1970s establishes that Grumman knew at the time that it had discharged extensive amounts of TCE into the soil and groundwater. Grumman knew that TCE was present in its recharge basins and sludge drying beds. SA__[DE554_7]. Grumman knew that it operated numerous degreasers for decades, SA__[DE552_4], and that the degreasers were prone to occasional spills, each of which would release ████████████████ JA__[DE421_56.1]_¶313; AOB47. Grumman knew that a 4,000-gallon TCE-storage tank█████████████ ███████████████ had been leaking TCE directly into the soil *for several years* in the early 1970s before the problem was identified and the tank replaced. SA__[DE 552_7]; JA__[DE421_56.1]_¶47. Grumman's own brief admits its knowledge of the leaking TCE-storage tank. AOB6, 46-47. Grumman also knew that in April 1977, tests still revealed an abnormally high concentration of TCE directly next to that tank. SA__[DE554_5]. Indeed, a former Grumman employee testified that to identify TCE in Grumman's water, all one "had to do was drink it"—drinking the water would cause him to "burp," and he could smell TCE on his breath. JA__[DE388_Heskin_Ex.78_67-68, 139-40].

In response to these events, Grumman retained a consulting firm, Geraghty

9

& Miller, to help assess the extent and cause of groundwater TCE contamination.

Geraghty & Miller explicitly and repeatedly confirmed to Grumman that it was a

potential source of TCE contamination:

    • Geraghty & Miller's preliminary assessment, on June 25, 1976,

informed Grumman that, ████████████████████████████

████████████████████████████████

███████████████████████████████████

████████████████████

██████████████████████

█████████████████████████████

█████████████████████████████

███████████████████████████████████

████████████████████

    • On January 5, 1978, the firm reported that on at least one occasion

in a single three-day study period, the firm detected a higher level of TCE in

discharge wastewater than when the water was drawn from the well.

JA__[DE436_Calland_Ex.111_228-29].  The report states that the

contamination "probably derived from housekeeping practices (spills,

cleanup of equipment, etc.) or some intermittent activity of an unknown

kind."  *Id*; *see* JA__[DE388_Heskin_Ex.26_275] (Grumman report

10

describing incident in similar terms).

- That same January 1978 report found that a well on the Facility grounds but upgradient from Hooker was contaminated with TCE. SA__[DE554_8]; JA__[DE436_Calland_Ex.111_217, 258-59] (identifying TCE in Well 16).

In light of these reports, Grumman itself acknowledged in a January 1979 report that it had used TCE, that "several sources of potential discharge exist in our plants," and that its operations had been found to introduce excess amounts of TCE into the water it discharged. JA__[DE388_Heskin_Ex .26_273, 275-76].

Third parties also believed Grumman was responsible for TCE contamination. On November 22, 1977, the Bethpage Water District ("BWD") asserted that Grumman was responsible for polluting BWD wells with TCE and demanded that Grumman pay damages. JA__[DE388_Heskin_Ex.24_765-66]. BWD asserted that the cost of remediating the damage caused by "discharge of waste products" from Grumman's facilities would "minimally run into hundreds of thousands of dollars." JA__[DE388_Heskin_Ex.24_765]. On February 1, 1978, BWD reiterated that "there is a sound basis for making a claim against Grumman ... for ground water contamination," and that it "inten[ded] to pursue this matter." JA__[DE388_Heskin_Ex.25].

Grumman did not provide any form of contemporaneous notice to Century

11

of its TCE leaks and spills, of TCE testing results, of public reports of TCE contamination, of TCE-tasting water, of Geraghty & Miller's findings, or of BWD's complaints about well contamination.

   c.    *The 1983 PRP Letter And Grumman's Purported Notice*

On December 6, 1983, the New York State Department of Environmental Conservation ("NYSDEC") sent Grumman a letter identifying it as a potentially responsible party ("PRP") for certain contamination at the Bethpage Facility ("1983 PRP Letter").  JA__[DE388_Heskin_Ex.32_114].  Grumman included the 1983 PRP Letter in a package of materials it ostensibly sent to Travelers on January 30, 1984.  *Id.*  Grumman's cover letter specifically advised that all of the enclosed materials were related to a *different* lawsuit concerning a *different* site, i.e., the State of New York's federal lawsuit concerning the Old Bethpage Landfill described above, *supra* at 8.  The cover letter stated that "[e]nclosed is additional information on the above captioned for your file," *id.*, referencing the caption for the federal-court action, i.e., "Grumman Corporation, New York State vs. Town of Oyster Bay, et al."  JA__ [DE388_Heskin_Ex.32_110].  The cover letter was addressed to Travelers, but also listed a Century representative in the "cc" line.  *Id.*

The first attachment was a note from Grumman to its broker stating that the "site in question is no longer in use," which was not true of the Bethpage Facility. The second attachment explained, ████████████████████████████████

12

Letter "cover[ed] any potential damage to the State's natural resources attributable to [Grumman's] on-site sludge drying bed, identified as site #130003." JA__[DE388_Heskin_Ex.32_112]. The Old Bethpage Landfill federal-court action concerned sludge dumped at the Landfill from the site #130003 sludge-drying bed. JA__[DE388_Heskin_Ex.30_903]. The third document enclosed was the 1983 PRP letter. JA__[DE388_Heskin_Ex.32_114]. That one-page document asserts a "claim" by the State of New York against Grumman under CERCLA and other laws, for Grumman's contamination of "Site 130003," i.e., Grumman's already-remediated sludge-drying bed, from which it had sent sludge to the Old Bethpage Landfill. *Id.*; JA__[DE359_Cannella_Ex.20_202] (NYSDEC 1983 site #130003 description noting remediation already complete).

The package was placed in Century's file for the Old Bethpage Landfill federal-court lawsuit, just as Grumman's cover letter instructed. SA__[DE554_14].

    d.    *NYSDEC's 1986 Site-Wide Investigation For TCE And Other Chemicals*

During a meeting with Grumman on December 11, 1986, and following up on an October 22, 1986 letter, ███████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ An internal Grumman memo warned that the request for a general field investigation "could be

13

the first step leading to a very serious and expensive liability of Grumman for possible cleanup costs, *if* it were determined Grumman contributed contaminants to the groundwater and a cleanup of some kind was required." *Id.* (emphasis in original). The Grumman memo further recognized that "the possible cleanup costs, which could also be assessed against Grumman, could be enormous, i.e., conceivably in the 10-20 million dollar range." JA__[DE388_Heskin_Ex.40_206-07]. The memo advised that these new requests "could be the opening gun in a long, drawn-out controversy about the matter." JA__[DE388_Heskin_Ex.40_207].

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████

In January 1987, the NYSDEC told Grumman it had reclassified the Facility as a Class 2 site, meaning it posed "a significant threat to the public health or environment." JA__[DE359_Cannella_Ex.36]. At the same time, the NYSDEC Registry of Hazardous Waste Disposal Sites description of site 130003 was amended to mention "TCE contamination" for the first time. JA__[DE359_Cannella_Ex.36_061].

In 1990, Grumman entered into a consent order with NYSDEC, requiring Grumman to conduct a full-scale remedial investigation and feasibility study

14

("RI/FS") to address the massive plume of contaminated groundwater under the Facility.  JA__[DE388_Heskin_Ex.47]

NYSDEC issued a report in 1995 finding that Grumman's 4,000-gallon TCE-storage tank—which Grumman knew was leaking more than two decades earlier, *see supra* at 9—was indeed the source of the TCE contamination in that area.  JA__[DE388_Heskin_Ex.48_504-05].

Grumman has removed at least ███████████ of TCE from the site. JA__[DE388_Heskin_Ex.73].

Grumman did not promptly notify Century that NYSDEC in 1986 had expanded its investigation of contamination at the Facility from a single sludge-drying bed to groundwater contamination from the entire Facility, that Grumman itself in 1987 viewed the expanded NYSDEC investigation as the "opening gun" in a multimillion dollar legal controversy, that NYSDEC in 1987 reclassified the Facility as a major threat to public health and for the first time identified TCE contamination as a concern, that Grumman entered a consent order with NYSDEC in 1990 requiring the RI/FS, or that NYSDEC in 1995 found that the leaking TCE storage tank Grumman had known about since the early 1970s was in fact a source of TCE groundwater contamination.

2.  *The Bethpage Community Park*

The second site at issue, the Bethpage Community Park, is located on the

15

northeast boundary of the Bethpage Facility.  JA__[DE493_Heskin_Ex.11]; JA__[DE80_Heskin_Ex.5_761].  ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████  Grumman also used portions of the area to dry and bury sludge generated by the Facility.  JA__[DE80_Heskin_Ex.8_536– 37].  In 1962, Grumman donated the land to the Town of Oyster Bay for use as a community park.  AOB5.

Grumman knew by mid-2001 that the Park's soil was contaminated. JA__[DE436_56.1]_¶45.  Grumman confirmed excessive levels of several contaminants in the soil ███████████  but then waited ███████████  to warn Oyster Bay that its community's children were playing on toxic dirt. JA__[DE388_Heskin_Ex.53_159].  ███████████████████ Oyster Bay leaders immediately closed the Park on May 2, 2002. JA__[DE388_Heskin_Ex.82_155-56].

In July 2002, NYSDEC sent Grumman a notice of responsibility for contamination in ███████████████  JA__[DE388_Heskin_Ex.55_759].  In December 2002, Oyster Bay officials sent Grumman a letter stating that Oyster Bay also intended to sue Grumman and hold

16

it liable for that contamination.  JA__[DE388_Heskin_Ex.59].  Oyster Bay

ultimately filed suit on April 21, 2005.  JA__[DE436_56.1]_¶56.  Grumman

notified Century of the suit seven-and-a-half weeks later on June 14, 2005.

JA__[DE388_Heskin_Ex.65].



Despite—or more likely *because of*—that

advice, Grumman did not forward the 2002 NYSDEC letter to Century.

Grumman now seeks coverage of the costs attributable both to NYSDEC's

investigation at the Park and to Oyster Bay's suit arising from Park contamination.

3.    *The Water Board District Sites*

Grumman also seeks to establish coverage of costs incurred in response to

claims from the three Water Districts:  the South Farmingdale Water District

("SFWD"), the Aqua New York Water District ("AWD"), and the Massapequa

Water District ("MWD").  The Water Districts are responsible for providing

drinking water to residents who live near, and downgradient from, the Bethpage

17

Facility.  The Water Districts draw water exclusively from Magothy aquifer, the

only source of drinking water in the area.  SA__[DE557_2-3].

By October 2000, Grumman realized that the groundwater contamination it

had caused was likely to reach these downgradient water districts.  It estimated that

the "worst-case capital cost" involved in avoiding further contamination of public

water supplies would be ███████████  JA__[DE359_Hultman_Ex.28_361].

In late 2000, NYSDEC proposed a remediation plan for containing the

groundwater plume and invited public comments.

JA__[DE359_Hultman_Ex.30_692-93].  In December 2000, representatives from

the SFWD and MWD stated their intent to submit formal responses to ensure that

Grumman would address the groundwater problem.

JA__[DE359_Hultman_Ex.30_736-38].  In a meeting with Grumman in November

2000, AWD and SFWD insisted that Grumman cover the costs of containing the

contamination.  SA__[DE557_17].  Grumman had similar meetings with all three

Water Districts in January of 2001.  SA__[DE557_18].  Grumman admitted that

after those meetings it understood that the Water Districts were seeking to hold

Grumman responsible for the costs of keeping their water supply clean.

JA__[DE359_Hultman_Ex.81_189].

On January 11, 2001, the SFWD and AWD sent a letter detailing the steps

they believed Grumman was required to take and suggested the NYSDEC should

18

require Grumman to "provide a letter of credit that would be sufficient to cover all anticipated future costs." JA__[DE359_Hultman_Ex.31_007].[1] The MWD similarly wrote NYSDEC on January 17, 2001, noting the risk of contamination and demanding a work plan from Grumman. JA__[DE359_Hultman_Ex.33_322-24].

On February 2, 2001, Grumman committed to pay for the Water Districts' future remediation costs. SA__[DE557_18].

Grumman did not notify Century of the Districts' claims until 2009 at the earliest. SA__[DE557_19].

### C. Proceedings Below

Travelers commenced this action in March 2012. As relevant here, Grumman filed cross-claims seeking to establish coverage under the Century policies for costs incurred in response to claims at the foregoing sites. The district court held that Grumman was not entitled to coverage because it failed to comply with the Century policies' notice requirements.

The district court held that Grumman was obligated to provide notice of contamination at the Bethpage Facility by the late 1970s. SA__[DE554_4]. The court detailed the "numerous facts show[ing] that there was an 'occurrence or

---

[1] Prior to 2006, the AWD was known as the New York Water Services Corporation.

19

accident' prior to and in 1976." SA__[DE554_4-5]. The court rejected as legally insufficient Grumman's excuses for failure to give notice of this contamination until 1984 at the earliest, and further held that the alleged 1984 notice—the package updating Travelers about the Old Bethpage Landfill suit—in any event did not constitute effective notice to Century of TCE contamination at the Bethpage Facility. SA__[DE554_6-11, 13-15]. Finally, the district court explained that *even if* Grumman lacked any notice obligation prior to 1983, and *even if* the 1984 Old Bethpage Landfill update package were adequate to provide notice of an occurrence or claim at the Facility in the 1970s, Grumman's 1984 notice was still late as a matter of law. SA__[DE544_15-16].

The district court likewise ruled that Grumman breached its notice obligations regarding the Bethpage Community Park. Grumman knew by 2001 and 2002 of contamination at the Park and claims against Grumman, but did not notify Century of those developments until 2005. SA__[DE554_12]. The court found that Grumman's multi-year delay "constitutes late notice as a matter of law." SA__[DE554_13].

Finally, the district court held that the three Water Districts made claims in 2001 and 2002, but Grumman inexcusably failed to provide notice of those claims until at least 2009. SA__[DE557_18-19]. Even though the Water Districts were participating as interested parties in the NYSDEC action in 2002, they were

20

asserting their own rights and making their own demands, which constituted

"claims" under the policies and New York law.  SA__[DE557_18-19].

## SUMMARY OF THE ARGUMENT

I.  Grumman is not entitled to coverage of costs related to contamination

from TCE and related pollutants at the Bethpage Facility because it was required to

provide notice by the late 1970s, which it did not do.  Grumman was indisputably

aware of a TCE contamination occurrence at the Facility by the 1970s.

Grumman's only argument is that notice was not required at that time because

Grumman reasonably believed it would be immune from liability for that

contamination.  But Grumman provides no evidence that it actually made a

deliberate determination that notice was not required for that reason, as required to

excuse its delay in providing notice.

Nor would such a determination have been reasonable.  Grumman says it

could reasonably have concluded that Hooker was the sole source of the

contamination because some third parties so concluded at the time.  But Grumman

knew more than they did:  Grumman knew that its Facility had leaked and spilled

TCE repeatedly, that its own consultant had repeatedly identified Grumman as a

potential source, and that BWD had explicitly warned Grumman that it was liable

for groundwater contamination.  In light of those undisputed facts, it would not

have been reasonable, but wildly irresponsible, for Grumman to conclude that it

21

faced no prospect of liability because Hooker was the sole source of TCE contamination. Grumman also cites its 1978 permit for *future* discharges, which is irrelevant to its liability for *past* contamination. Finally, Grumman ultimately concedes that it knew it could face liability when CERCLA was enacted, which occurred in 1980, more than *three years* before the January 1984 communication Grumman now cites as notice of the 1970s occurrence.

That communication was not notice in any event; Grumman did not give actual notice of the 1970s occurrence or any claim arising from that occurrence until decades later. The January 1984 communication did not qualify as notice of the Facility TCE contamination or any related NYSDEC claim for multiple reasons. First, the communication failed to identify any Century policies under which coverage was sought. Second, the communication explicitly addressed a different lawsuit at a different site—New York's federal lawsuit involving the Old Bethpage Landfill—confirming that even Grumman itself did not consider it notice of an occurrence or claim involving TCE contamination at the Facility. Third, the communication provided none of the information contractually required for notice of an occurrence and claim involving TCE contamination at the Facility.

Even if the 1984 communication qualified as notice of a NYSDEC claim, Grumman delayed sending it for more than seven weeks after NYSDEC made the claim. Grumman says Century suffered no prejudice from the unexplained delay,

22

but prejudice is irrelevant under New York law.

Finally, Century did not waive its late notice defense with respect to NYSDEC's claim at the Facility. Grumman first argues that Century waived by asserting other grounds for disclaiming coverage. But those supposed disclaimers were either not related to the NYSDEC claim or were not disclaimers at all. Grumman also argues that Century simply waited too long to assert the late notice defense. Grumman inexplicably ignores recent New York Court of Appeals precedent holding that an insurer is *not* barred from asserting a defense based solely on the passage of time. Grumman instead cites the decision on remand in that same case holding that waiver may be inferred from delay *plus other affirmative facts* permitting an inference of waiver, but Grumman cites no such facts here.

II. The district court also correctly denied Grumman coverage for costs related to the Bethpage Community Park, including costs incurred in response to NYSDEC's actions and Oyster Bay's April 2005 suit. Grumman was undisputedly aware of the occurrence at the Park by 2001-2002, but failed to notify Century until 2005. Grumman contends that it had *already* provided notice of the Park occurrence in the January 1984 communication concerning the Old Bethpage Landfill lawsuit. But that communication did not provide notice of any new claim or occurrence, and certainly did not provide notice of an occurrence at the Park,

23

which Grumman was *not even aware of* until 2001 and 2002.

Grumman also failed to provide timely notice of Oyster Bay's 2002 claim. Although Oyster Bay asserted a different legal theory in its 2005 suit, Oyster Bay's 2002 actions constituted the claim for which notice was required. And even after Oyster Bay actually sued in 2005, Grumman still delayed two months before notifying Century—delay that itself bars coverage.

III.  Grumman also provided late notice of the Water Districts' claims. The Districts made claims in 2000 and 2001 when they sought to hold Grumman liable for contaminating their wells, but Grumman did not provide notice until 2009 at the earliest. It is irrelevant that the Water Districts in 2001 and 2002 did not file their own separate suits, but instead asserted their rights through existing NYSDEC actions. A "claim" under New York law requires only that the party assert its own rights against the insured, which is exactly what the Water Districts did.

## STANDARD OF REVIEW

An order granting summary judgment is reviewed de novo. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). A "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Id.*

24

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO CENTURY ON THE BETHPAGE FACILITY CLAIM BECAUSE GRUMMAN FAILED TO GIVE TIMELY NOTICE OF BOTH THE OCCURRENCE AND THE CLAIM**

Under the Century primary policies, Grumman was required to provide notice "as soon as practicable" after "an accident." SA__[DE554_3]. The excess policies similarly required "written notice" "as soon as practicable" upon "the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of the" insurer. *Id.* Proper notice under such provisions "is a condition precedent to an insurer's liability." *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 438 (2d Cir. 1995). Under New York law, delays in providing notice of just one-to-two months are routinely held unreasonable as a matter of law. *See infra* at 46-47 & n.5.

Here, the district court properly held that Grumman was obligated to provide notice of the occurrence at the Bethpage Facility by the late 1970s, but did not do so until at least 2005. The district court also properly held that, even on Grumman's view that its notice obligation was not triggered until it received the 1983 PRP Letter, Grumman failed to give notice of that claim in January 1984.

A. **Grumman's Obligation To Give Notice Of TCE Contamination At The Facility Accrued In The 1970s**

The occurrence for which Grumman seeks coverage is the widespread soil

25

and groundwater TCE contamination at the Bethpage Facility.  Grumman nowhere

disputes that this occurrence happened by the 1970s.  AOB6-7, 66.  Nor does

Grumman deny that it was well aware of the multiple TCE discharges that had

occurred at the Bethpage Facility by the 1970s.  *See supra* at 9.  Grumman's sole

argument is that it was not required to provide notice until it received the 1983

PRP Letter, because until then, Grumman says, it reasonably believed that it would

evade liability for its known acts of contamination.

An insured seeking to excuse its delay in providing notice on the ground that

it believed it could not be held liable for the occurrence bears "the burden of

showing the reasonableness of such excuse."  *White v. City of N.Y.*, 81 N.Y.2d 955,

957 (1993); *see Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 287 (2d

Cir. 2003).  Importantly, an insured is *not* excused from notice merely because it

believes there will be a legitimate dispute over its liability for the occurrence.  The

notice obligation is triggered so long as there is a "reasonable possibility"—not a

"probability," "much less a certainty"—of liability implicating the policy at issue.

*Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 276 (2d

Cir. 1992).  That is, the question "is not whether the insured believes he will

ultimately be found liable for the injury, but whether he has a reasonable basis for

a belief that no claim will be asserted against him."  *SSBSS Realty Corp. v. Pub.

Serv. Mut. Ins. Co.*, 253 A.D.2d 583, 584 (1st Dep't 1998); *see Sparacino* v.

26

*Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995) (test is "whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim"). In short, the insured must prove that an "ordinary prudent person could have reasonably believed himself to be immune from potential civil liability under the circumstances." *Phila. Indem. Ins. Co. v. Genesee Valley Improvement Corp.*, 41 A.D.3d 44, 47 (4th Dep't 2007) (quotation omitted).

Moreover, the insured must prove that its asserted excuse for not providing notice is *the actual reason* it did not provide notice at the time. *See Long Island Lighting Co. v. Allianz Underwriters Ins. Co.*, 805 N.Y.S.2d 74, 75 (1st Dep't 2005) ("We reject plaintiff's argument that there was a reasonable possibility that the subject policies, both excess, would not be reached…, where plaintiff offers no evidence that the timing of its notice was the result of a deliberate determination to that effect …."). And the insured may not rely on its ignorance of the relevant facts if it failed to conduct a reasonable investigation. *See Christiania*, 979 F.2d at 276 ("Defendant cannot complain that it did not see something when it shut its eyes."); *Green Door*, 329 F.3d at 287 ("An insured … must exercise reasonable care and diligence and keep itself informed of accidents out of which claims for damages may arise.'"). In sum, as this Court has explained, if there are "factors suggesting" "a possibility" that the policy "would be implicated," an insured must

27

undertake an investigation to "negate that possibility." *Christiania*, 979 F.2d at

276. When such a possibility cannot be negated, notice is required. *Rockland*

*Exposition, Inc. v. Great Am. Assurance Co.*, 746 F. Supp. 2d 528, 540 (S.D.N.Y.

2010), *aff'd* 445 F. App'x 387 (2d Cir. 2011).

Grumman therefore bears the burden of proving that it did not provide notice

prior to 1983 of its TCE discharges at the Bethpage Facility because it had actually

determined that there was no possibility the known contamination would give rise

to claims implicating Century's policies, and that it acted reasonably in making

that determination. Grumman does not and cannot make those showings.

1. *Grumman Has Produced No Evidence That It Actually Believed In*
*The 1970s That It Could Not Be Held Liable For TCE Contamination*
*At The Bethpage Facility*

Grumman offers no evidence that, despite its awareness of the widespread

TCE contamination at Bethpage, Grumman *actually made a deliberate*

*determination* that it could not face any liability that would implicate Century's

policies. Grumman relies solely on documents created by *third parties* to show

that it would have been reasonable, in theory, for *someone* to have believed that

groundwater contamination at the Bethpage Facility would not result in a claim

involving Century's policies. *E.g.*, AOB69. Nowhere does Grumman cite or

reference any contemporaneous document from Grumman, or the testimony of a

Grumman employee from any period, indicating that Grumman *at the time* actually

28

analyzed the facts and law and determined that notice was not required because Grumman faced reasonable possibility of liability for the contamination.

That fundamental failure of proof defeats Grumman's excuse for its late notice. To excuse itself from the requirement of proving notice to Century when it became aware of TCE contamination at the facility, Grumman was required to adduce evidence that it made a "deliberate determination" to forgo or delay notice of the incident. *Allianz Underwriters*, 805 N.Y.S.2d at 75. Excuses unsupported by any such evidence are insufficient as a matter of law. *Id.* Grumman's gaping failure of evidentiary proof on this essential element by itself compels affirmance of the decision below.

2. *If Grumman Did Believe In The 1970s That It Would Never Be Liable For TCE Contamination At The Facility, That Belief Was Unreasonable*

Even if Grumman *actually* believed in the 1970s that there was no possibility that it would face a claim implicating Century's coverage, that belief would have been unreasonable as a matter of law. Grumman knew by at least 1977 that the groundwater at and around the Bethpage Facility was contaminated by TCE. *Supra* at 8-11. And the undisputed evidence—most of which Grumman makes no effort to address—demonstrates that a reasonable insured in Grumman's position would have known long before 1983 that there was a reasonable possibility it would face a claim for that contamination.

a. *Grumman Knew It Had Caused TCE Contamination*

Grumman of course knew that it had been using ▮▮▮▮▮▮▮▮▮▮ TCE per

year for decades as part of its routine operations. JA__[DE436_56.1]_¶6. And as

early as 1976, Grumman had "a number of news articles in its files that referred to

groundwater contamination at the Bethpage Facility, linked it to Grumman, and

discussed remediation efforts." SA__[DE554_5]; *see, e.g.,*

JA__[DE388_Heskin_Ex.18_135] ("Contamination has so far been tentatively

linked to the Grumman plant and a nearby chemical company."). Grumman also

had extensive first-hand knowledge that it had discharged significant amounts of

TCE, including through the years-long leak from its 4,000-gallon TCE tank and

regular spills from its degreasers. *See supra* at 9.

And all that was *before* Grumman received reports from its *own consultant*

identifying Grumman as a potential source of TCE contamination. On June 25,

1976, Geraghty & Miller advised Grumman that, in a best-case scenario,



30

████████████████████████████████████████████ These

other contaminated wells were directly upgradient from the contaminated BWD

wells, which BWD unsurprisingly claimed were polluted by Grumman.

On January 5, 1978, Geraghty & Miller reaffirmed that certain

contamination "probably derived from housekeeping practices (spills, cleanup of

equipment, etc.) or some intermittent activity of an unknown kind."

JA__[DE436_Calland_Ex.111_228-29]; JA__[DE388_Heskin_Ex.26_275]

(Grumman report describing this event in similar terms). The same Geraghty &

Miller report found that a Facility well upgradient from Hooker was contaminated,

meaning that, unless Grumman thought water flowed uphill, it knew its own

operations were very likely the source. SA__[DE554_8].

On appeal, Grumman attacks only the district court's reliance on Geraghty

& Miller's January 5, 1978 report (AOB70), but its argument simply confirms

Grumman's knowledge of the contamination it had caused. As Grumman

observes, Geraghty & Miller sampled Grumman's wastewater discharges over a

single three-day period, and found that the discharges were *generally* less

contaminated with TCE than the water Grumman initially drew from the ground to

use in its operations. But Grumman also acknowledges that the report cited one

incident of excess contamination in discharged water in that three-day period. *Id.*

█████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████

███████████████████ According to the report, the one incident

of excess TCE contamination in the Facility's wastewater discharges was

"probably derived from housekeeping practices (spills, cleanup of equipment, etc.)

or some intermittent activity of an unknown kind."

JA__[DE436_Calland_Ex.111_228].

The Geraghty & Miller report thus told Grumman the following: its

ordinary operations did not routinely discharge wastewater with excessive TCE

levels, but in just *a single three-day period*, some unidentified accident or activity

had caused a significant discharge of cancer-causing agents into the groundwater.

And Grumman had been using TCE in exactly the same manner *for decades*.

Unless Grumman is pronouncing itself to be an astonishingly incompetent or

irresponsible industrial operator—a naif awed by cosmic coincidences of timing—

Grumman took away from the Geraghty & Miller report the knowledge that either

its "housekeeping practices," or some unknown "intermittent activity," or both,

were very likely causing frequent discharges of wastewater with excessive TCE

levels.

Finally, if there were by this point any plausible room for doubt about the

reasonableness of Grumman's expectations concerning the possibility of a claim arising from its known TCE spills, leaks, and discharges, that doubt is erased by the *actual claim* asserted by BWD in November 1977, when BWD charged in a letter to Grumman that "contamination of the public water supply" has "arisen by virtue of discharge of waste products from your company," and stated that the cost of remediating the damage "will minimally run into hundreds of thousands of dollars." JA__[DE388_Heskin_Ex.24_765]. The BWD letter goes on to demand "appropriate redress" from Grumman. JA__[DE388_Heskin_Ex.24_766]. BWD reiterated its legal threat in a February 1, 1978, letter announcing that "there is a sound basis for making a claim against Grumman . . . for ground water contamination" and warning that "[i]t is our intention to pursue this matter." JA__[DE388_Heskin_Ex.25].

Grumman's observation that BWD ultimately did not file a complaint at the time (AOB72) misses the point: BWD's legal warning confirms that Grumman could not have reasonably believed that it would be immune from legal responsibility for TCE contamination at the Bethpage Facility. ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

33

██████████████████████████

██████████████████████████████

On that undisputed record, no reasonable juror could find that Grumman acted reasonably in concluding (if it did) that it could not face liability for its known TCE contamination at the Facility.

b.    *Grumman's Contrary Arguments Are Meritless*

Grumman has no plausible explanation for its failure to provide Century notice for years after it became reasonably likely that it would face liability for contamination at the Bethpage Facility.

i. Grumman first observes that its activities at the Facility were "lawful and undertaken pursuant to permits issued by the regulatory authorities."  AOB67.  The observation is a non sequitur.  Grumman's permits merely allowed *prospective* discharges of wastewater; they do not reflect "a factual finding that no claim could occur relating to any prior period."  SA__[DE554_10].  In other words, the fact that Grumman was authorized to discharge wastewater *in the future* did nothing to immunize Grumman from claims that it contaminated the groundwater *in the past*, through earlier wastewater discharges or spills and leaks.  Indeed, Grumman agrees that even before CERCLA was enacted, a private plaintiff could have brought suit against Grumman—despite its permits for future activity—if it could show that "Grumman had released the contaminants that caused the environmental damage."

34

AOB68.  And as just explained, Grumman *knew* that it had caused significant TCE releases for years before 1984, when Grumman says it gave notice.  The fact that Grumman was operating under a prospective permit at the time is beside the point.

Grumman's permit-based argument in any event at most would excuse Grumman's late notice only until 1980—years before Grumman even allegedly provided notice.  Grumman's argument rests entirely on the proposition that before CERCLA was enacted, Grumman did not face "retroactive liability for contamination based on its status as an owner and operator of the Bethpage site," and thus could have reasonably believed that its regulators' grant of a permit to continue its operations meant that "those regulators, as well as third parties, were unlikely to sue Grumman."  AOB67.  But CERCLA's effective date was *December 1980*, after which point even Grumman admits that it was subject to automatic and retroactive liability for its contamination at the Bethpage Facility.  *Id.*  Grumman cannot excuse its failure to give notice for years after becoming subject to strict CERCLA liability.

ii.  Grumman next contends that it would have been reasonable for Grumman to conclude that the only source of the publicly-discussed TCE contamination was Hooker.  AOB68.  That conclusion—if there were any evidence that Grumman actually reached it—would have been embarrassing, not reasonable.  First, Grumman focuses almost entirely on the presence of vinyl chloride in the

35

water, which Grumman allegedly did not use.  AOB68.  But the water *also* had significant levels of TCE, which is the focus of this case and which Grumman elsewhere acknowledges is "at the center of Grumman's remediation efforts." AOB7.  In a footnote, Grumman absurdly suggests that someone reasonably might have thought Hooker was the only source of *all* TCE because Hooker had discharged untreated waste materials "across the street" from the affected wells. AOB68 n.7.  But Grumman knew that it, too, had discharged TCE "across the street" from the wells.  JA__[DE493_Heskin_Ex.11]; *supra* at 9.  Whatever an outside third party with limited information might reasonably have believed, it would have been outright foolish for Grumman to conclude that Hooker was the sole source of TCE contamination.

Second, ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

And in any event, even the NCDOH had publicly concluded *by December 1976* that "[t]he Grumman industrial operations ... use similar chemical compounds

36

which may be contributing to the problem." JA__[DE436_Calland_Ex.97_994].

Finally, there is no merit to Grumman's argument that the conflicting public record concerning responsibility for TCE contamination in the 1970s also reflects "conflicting evidence on the reasonableness" of a conclusion that Grumman could not face liability for such contamination. AOB70. At most, the record shows that some *publicly-available* evidence pointed to Hooker as *a* source, while other publicly-available evidence also pointed to Grumman. The public record completely omits all the evidence Grumman itself possessed—and did not share, either with the public or with Century—establishing that Grumman had been responsible for TCE discharges. And if both Hooker and Grumman were sources

37

of contamination, they would both be liable. *See United States v. Alcanin Aluminum Corp.*, 990 F.2d 711, 721-22 (2d Cir. 1993) (joint and several liability under CERCLA).

Grumman's reliance on Hooker's contamination is thus irrelevant. The only question is whether Grumman itself was aware of facts that raised the possibility of a claim against it that would implicate Century's policies. *Christiania*, 979 F.2d at 276. There is only one reasonable answer to that question. At the absolute minimum, Grumman knew enough to conclude that it *could* be a source of TCE contamination for which it could be held liable, and it thus had the obligation to notify Century if it wanted the benefit of Century's coverage, or else to conduct further investigation to "negate that possibility." *Christiania*, 979 F.2d at 276. Grumman did not conduct such an investigation, which is reason enough reject its notice argument.[2]

iii. Grumman finally argues that it had no reason to believe in the 1970s that its potential liability would reach the $100,000 attachment point of Century's excess policies, AOB72-73, even though BWD warned that Grumman would be "minimally" liable for "hundreds of thousands of dollars," and Grumman itself later estimated that investigating and remediating the groundwater issues would

---

[2] Grumman finally did conduct an investigation in the late 1980s, which quickly confirmed that Grumman was a significant source of the TCE contamination. *See supra* at 15.

cost at least ██████ JA__[DE388_Heskin_Ex.43_422-23]. Grumman says these high figures are irrelevant because its liability would be "allocated pro rata across multiple policy years" and thus would never reach any one Century excess policy. AOB73. But there is no evidence whatsoever that Grumman actually considered its potential liability in the 1970s and concluded that notice was not required because, under pro rata allocation, its liability would never approach individual Century policy attachment points. A policyholder cannot excuse late notice based on "a reasonable possibility that the subject policies, both excess, would not be reached … where plaintiff offers no evidence that the timing of its notice was the result of a deliberate determination to that effect." *Allianz Underwriters*, 805 N.Y.S.2d at 75. Indeed, Grumman *could not* have relied on pro rata allocation to conclude that notice was not required in the 1970s—New York did not definitively adopt pro rata allocation until 2002. *See Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002). Before then, New York courts had not yet decided whether to allocate liability pro rata or hold each policy jointly and severally liable for the entire loss up to the policy limit. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1202 (2d Cir. 1995).

In short, the district court correctly concluded, as a matter of law, that Grumman was required to give Century notice of its known TCE discharges by the late 1970s, and in no event later than CERCLA's enactment date in December

39

1980.  No reasonable juror could conclude otherwise.

**B.**  **The District Court Correctly Held That The 1984 Travelers Old Bethpage Landfill Update Package Did Not Satisfy Grumman's Prompt-Notice Obligation**

Grumman argues that it was not required to give notice to Century until it received NYSDEC's December 6, 1983 PRP letter.  That argument is incorrect for the reasons explained in the prior section, but even if the 1983 PRP Letter first triggered Grumman's notice obligation, Grumman still did not satisfy that obligation.  Grumman says it provided notice when it copied Century on a January 30, 1984 package of materials that Grumman sent to Travelers.  As the district court held, that communication with Travelers did not satisfy Grumman's duty to give notice to Century for three reasons:  it did not identify any Century policies under which coverage was sought, it addressed a different suit at a different site, and it provided none of the information contractually required for proper notice.

1.  *The 1984 Package Did Not Provide Separate Notice To Century As To The Policies Under Which Coverage Was Sought*

Under New York law, a policyholder's notice obligation is not satisfied unless it gives direct notice to the insurer and identifies the specific policies the insured believes are implicated, because "[e]ach policy imposes upon the insured a separate, contractual duty to provide notice."  *Sorbara Constr. Corp. v. AIU Ins. Co.*, 11 N.Y.3d 805, 806 (2008).  In *Sorbara*, the insured held a workers' compensation policy and a liability policy with the same carrier, but provided a

40

single notice of occurrence that invoked only the workers' compensation policy. The court held that the notice "under the workers' compensation policy at the time of the incident did not constitute notice under the liability policy even though both policies were written by the same carrier." *Id.*

Grumman's notice fails *a fortiori* under *Sorbara* because its notice was sent to a *different* insurer and identified no Century policies under which coverage was sought. Grumman argues that *Sorbara* does not apply because Century itself issued only liability policies to Grumman, not two different types of policies like the insurer did in *Sorbara* . AOB74-75. Grumman misses the point—the communication in *Sorbara* was inadequate because it did not explicitly invoke the additional policy under which the insured was seeking coverage. The same is true here, but the problem is even more acute: not only did the communication here fail to identify any Century policy under which Grumman sought coverage, but the letter was directed to a different insurer with different policies.[3]

As courts applying New York law have consistently recognized, *Sorbara*'s "reasoning is clear: under New York insurance law, separate policies—whether issued by the same carrier or different carriers—create independent obligations to

---

[3] Contrary to Grumman's assertion, Travelers and Century had issued different types of policies. Travelers had issued both Environmental Hazard Policies—a limited coverage—and also broad CGL policies. Century issued only CGL policies.

provide separate notices of the same occurrence." *U.S. Underwriters Ins. Co. v. Landau*, 2010 WL 2517196, at *5 (E.D.N.Y. June 9, 2010); *see HDI-Gerling Am. Ins. Co. v. Liberty Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 125023, at *21 (W.D.N.Y. July 16, 2013); *Minasian v. IDS Property Cas. Ins. Co.*, 2015 WL 8485257, at *7 (S.D.N.Y. Dec. 9, 2015). Grumman indisputably failed to satisfy its independent obligation under Century's policies to provide separate notice *under those policies* of the occurrence for which it sought coverage.

Grumman also cites three lower court cases ostensibly holding that "providing notice by carbon copy is adequate." AOB74. But the problem here is not just the *form* of the notice, but its *substance*—if Century had been copied on a letter that *distinctly identified the Century policies under which coverage was sought* (and otherwise satisfied the requirements of notice), the fact that Century was addressed on the "cc" line rather than in the salutation might not be an issue. Unsurprisingly, none of the three cases cited by Grumman—all of which predate *Sorbara* by decades—remotely suggests that an insured satisfies its notice obligation by copying an insurer on a letter that does *not* identify the policies under which coverage is sought.

Grumman's first two cases are utterly irrelevant. They involve an *insurer's* statutory obligation to provide notice of a disclaimer of coverage to the *underlying claimant* in a bodily injury case; they hold unexceptionably that an insurer satisfies

42

that obligation by copying the claimant on the insurer's disclaimer to the insured. *See Allstate Ins. Co. v. Moon,* 89 A.D.2d 804 (4th Dep't 1982); *Miranda v. Aetna Cas. & Sur. Co.*, 51 A.D.2d 1035, 1036 (2d Dep't 1976). That principle has nothing to do with the substantive adequacy of Grumman's notice here.

Grumman simply misunderstands the third case it cites, *Dembitzer v. Gilliam*, 44 Misc. 2d 487 (Sup. Ct. 1964). There, the insured provided prompt, direct, and sufficient notice *to the insurer's agent*, just as Grumman should have done here. *Id.* at 488 ("The defendant Gilliam informed one Frank Collins, the agent of [the insurer], of the accident on the Monday following its occurrence."). The only "carbon copy" at issue was sent by the *underlying plaintiff's attorney*, not by the insured. *Id.*

Because there is "no dispute" that Grumman did not send Century a distinct notice "referring to the policies Century had issued," SA__[DE554_13], the 1984 communication to Travelers does not constitute adequate notice as a matter of law.

2.      *The 1984 Old Bethpage Landfill Update Package Did Not Relate To The Occurrence For Which Grumman Seeks Coverage*

The district court also correctly held that the 1984 package failed to provide notice of TCE contamination at the Bethpage Facility. SA__[DE554_14-15]. Indeed, the documents on their face make clear that even *Grumman* did not believe the package provided notice of that occurrence.

To start, the package's cover letter explicitly stated that the package merely

43

provided "additional information" concerning the existing Old Bethpage Landfill

federal lawsuit, which did not involve TCE contamination at the Facility. *See*

*supra* at 8, 12. The attachments confirmed the point. The first attachment, written

by Grumman itself, stated that the enclosures relate only to a site that "is no longer

in use," JA__[DE388_Heskin_Ex.32_111], which was not true of the Bethpage

Facility. In the second attachment, Grumman stated that the PRP letter was

████████████████████████ "attributable to [Grumman's] on-site sludge drying

bed, identified as site #130003," from which sludge was "removed *to the Old

Bethpage Landfill*." JA__[DE388_Heskin_Ex.32_112] (emphasis added). The

basis for the federal-court Landfill action was that sludge had been removed from

site #130003 to the Bethpage Landfill. JA__[DE388_Heskin_Ex.30_903]. And

the testing results included in the 1984 package *did not even test for TCE*, which is

the basis for remediation at the Bethpage Facility. The testing results instead

concerned chromium and other materials that were constituents of concern at the

Old Bethpage Landfill. JA__[DE388_Heskin_Ex.32_124-25]. NYSDEC's

description of site #130003 did not even mention TCE until 1986.

On that record, the district court was plainly correct in holding that

Grumman's January 30, 1984, update regarding Old Bethpage Landfill litigation

issues did not suffice to give Century notice of the TCE contamination occurrence

at the Bethpage Facility. Grumman says that "strict compliance" with its notice

44

obligations was not required (AOB75), but the Old Bethpage Landfill update package plainly did not provide adequate notice of TCE contamination under any standard. Grumman also suggests that Century bore the burden to "clear up the uncertainty" caused by the Old Bethpage Landfill update. AOB76. But the point is that *there was no uncertainty*—Grumman explicitly instructed Travelers that the package concerned the existing Old Bethpage Landfill action, and the contents of the package confirmed that instruction. No case holds that an insured can *sub silentio* notice a new occurrence by updating a different insurer about a different occurrence.[4]

3. *The 1984 Old Bethpage Landfill Update Package Did Not Include All "Reasonably Obtainable Information" Related To Contamination At The Facility*

Finally, and independent of the foregoing, the 1984 Old Bethpage Landfill update package came nowhere close to providing Century all the information Grumman was contractually required to provide in a proper notice of an occurrence at the Facility. The Century policies specifically required Grumman to provide all "reasonably obtainable information" or "the fullest information obtainable at the time" related to the occurrence. SA__[DE554_3];

---

[4] Grumman cites *New York v. Amro Realty Corp.*, 936 F.2d 1420, 1430 n.10 (2d Cir. 1991). That case expressly did "not address the question" whether notice was timely, *id.* at 1429, and in any event predates *Sorbara* and did not involve anything like Grumman's explicit representation that it was not providing notice of a new claim or occurrence.

JA__[DE239_Walsh_Ex.8_670] (excess policy language). If Grumman believed that the 1983 PRP Letter related to TCE contamination at the Facility, Grumman was required to forward to Century the extensive information Grumman possessed regarding its knowledge of TCE releases. *See supra* at 6-11. Grumman's own brief on appeal makes clear how critical such information is to its coverage claims. AOB6; AOB46-48. But Grumman included *none* of it in the 1984 Old Bethpage Landfill update. That omission is both an independent failure to comply with the policies' notice requirements and a confirmation that Grumman itself did not believe its 1984 letter constituted notice of a TCE contamination occurrence at the Bethpage Facility.

### C. Grumman's Notice Of The NYSDEC Claim Was Untimely As A Matter Of Law

The district court correctly held, in the alternative, that even *if* notice was not due until Grumman became aware of the 1983 NYSDEC claim, and even *if* the 1984 package constituted effective notice, the seven-week delay between those two events would *still* fail to satisfy, as a matter of law, Grumman's obligation to provide notice of a claim "immediately" or "as soon as practicable."

As this Court recently held, "[u]nder New York law, delays of one or two months are routinely held unreasonable" as a matter of law. *Indian Harbor Ins. Co. v. City of San Diego*, 586 F. App'x 726, 729 (2d Cir. 2014) (58-day delay

46

unreasonable).[5]  The delay here was at least 48 days.  The 1983 PRP Letter was

sent on December 6, 1983, and was received by Grumman by at least December

13, 1983.  JA__[DE388_Heskin_Ex.32_114].  Rather than forward that claim

"immediately" or "as soon as practicable," Grumman then took a month to prepare

a short internal memorandum describing the claim, dated January 11, 1984.

JA__[DE388_Heskin_Ex.32_112].  Grumman then waited until January 24,

1984—an additional 13-day delay Grumman makes no attempt to explain—to

forward that memorandum to its broker.  JA__[DE388_Heskin_Ex.32_111].  At

that time, Grumman directed its broker only to ███████████████████████ *id.*,

which the broker did on January 30, copying Century.

Lacking any actual justification for its seven-week delay, Grumman argues

that its delay should be ignored because of the "glacial pace" at which the

NYSDEC proceeding has progressed.  AOB78-79.  But the pace of a claimant's

case prosecution has no bearing on the insured's obligation to provide immediate

notice of the claim.  Grumman's argument is simply another way of saying that

because things moved slowly, Century suffered no prejudice from the delay, but

prejudice is *categorically irrelevant*—late notice bars coverage under New York

---

[5] *See Metro. Transit Auth. v. Tutor Perini Corp.*, 564 F. App'x 618, 620 (2d
Cir. 2014) (58-day delay); *Am. Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d
76, 78 (2d Cir. 1993) (36-day delay, and collecting New York cases holding delays
of 10, 13, 22, and 28 days unreasonable).

law even absent prejudice. *Am. Home Assurance Co. v. Int'l Ins. Co.*, 90 N.Y.2d 433, 440 (1997) ("it is settled law in New York that … the insurer need not show prejudice before it can assert the defense of non compliance" (quotation omitted)). This rule, "by encouraging prompt notice, enables insurers to investigate claims promptly and thus to deter or detect claims that are ill-founded or fraudulent." *Briggs Ave., LLC v. Ins. Corp. of Hannover*, 11 N.Y.3d 377, 381-82 (2008). Because Grumman indisputably did not forward the PRP letter promptly as required by the Century policies, its coverage claim is barred as a matter of law.

### D. Century Did Not Waive Its Notice Defenses As To The Bethpage Facility

Finally, Grumman argues that even if it failed to provide timely notice of TCE contamination at the Bethpage Facility, Century waived its late notice defense with respect to the NYSDEC claim. The district court correctly rejected that argument.

Under New York law, "waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it. ... Such a waiver must be clear, unmistakable and without ambiguity." *Prof'l Staff Congress-City Univ. of N.Y. v. N.Y. State Pub. Emp't Relations Bd.*, 7 N.Y.3d 458, 465 (2006) (quotation omitted). Accordingly, waiver "should not be lightly presumed" and must be based on "a clear manifestation of intent" to relinquish a contractual right. *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968

48

(1988).

Grumman's waiver argument fails under this standard.  As an initial matter, the argument assumes that Grumman provided Century actual notice of the NYSDEC claim and TCE contamination occurrence in the 1984 Old Bethpage Landfill update letter.  Because that letter did *not* give Century notice of the relevant claim or occurrence, *see supra* at 43-45, Century was not required to assert the defense at that time.  *Luria Bros. & Co. v. All. Assurance Co.*, 780 F.2d 1082, 1090 (2d Cir. 1986) (no waiver where insurer "had no knowledge of the facts giving rise to the unasserted defense").

But even if, as Grumman contends, the 1984 Old Bethpage Landfill update package provided substantively adequate notice, Century did not waive its defense that the notice was late, because Century never manifested—clearly or otherwise— any conscious intent to relinquish that defense.

1.  *Century Did Not Waive Late Notice As To The NYSDEC Facility Claim Through Its Disclaimer On The Old Bethpage Landfill Claim*

Grumman first relies on the principle of waiver through "selective disclaimer," ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

49

███████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████

█████████████████████████████████

Obviously, an insurer cannot waive a defense to one coverage claim by asserting a different defense to a *different* coverage claim. *See, e.g.*, *Luria*, 780 F.2d at 1090. Grumman does not argue otherwise.

Grumman also asserts that Century had sufficient knowledge to assert a late notice defense in 2007, but that Century then selectively disclaimed coverage on the ground that the policies were missing. AOB80-81. █████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████ That comment is not a disclaimer of coverage on *any* ground, much less a clear manifestation of Century's intent to forgo a late-notice defense with full knowledge of all relevant facts.

50

2.   *Century Did Not Waive Late Notice Through The Mere Passage Of Time*

Grumman next argues that "Century waived its late-notice-of-claim defense by waiting decades to assert it."  AOB81–82.  Again, the factual premise is incorrect, because Century had no knowledge of the Bethpage Facility claim in 1984, and only discovered Grumman's concealment of critical information about its past TCE discharges when this lawsuit began.

In any event, Grumman's argument is squarely foreclosed by recent New York Court of Appeals precedent that Grumman fails even to mention, much less distinguish.  In *Keyspan Gas East Corp. v. Munich Reinsurance America, Inc.*, 23 N.Y.3d 583 (2014), the Court of Appeals held that that an "insurer will *not* be barred from disclaiming coverage simply as a result of the passage of time."  *Id.* at 590 (quotation omitted; emphasis added).  Instead, "delay in giving notice of disclaimer should be considered under common-law waiver … principles," which require facts *other than delay alone* to establish that the insurer "clearly manifested an intent to abandon [its] late-notice defense."  *Id.* at 591.

This might be a different case if Grumman argued and proved that it was *prejudiced* by any delay in Century's disclaimer of coverage.  Though irrelevant to waiver, prejudice from delay can justify a claim of *estoppel*.  *See Fairmont Funding, Ltd. v. Utica Mut. Ins. Co.*, 694 N.Y.S.2d 389 (1st Dep't 1999) ("Under the common-law rule, delay in giving notice of disclaimer of coverage, even if

51

unreasonable, will not estop the insurer to disclaim unless the insured has suffered

prejudice from the delay.").  But Grumman does not assert estoppel or argue

prejudice of any kind.[6]

Grumman instead relies only on the Appellate Division's decision on

remand from *KeySpan*, *Long Island Lighting Co. v. Am. Re-Ins. Co.*, 998 N.Y.S.2d

169 (1st Dep't 2014) ("*LILCO*").  According to Grumman, *LILCO* holds that a jury

may find waiver whenever an insurer "waits so long" to assert a right.  AOB82.

*LILCO* holds no such thing.  Indeed, as just noted, the Court of Appeals squarely

rejected exactly that proposition *in the same case*.  *KeySpan*, 23 N.Y.3d at 590.

The Appellate Division on remand instead recited numerous facts other than delay

that in the court's view suggested an affirmative intent to waive, including that (1)

one insurer wrote an internal memorandum acknowledging a potential late notice

defense, (2) other insurers had disclaimed coverage on late-notice grounds, and (3)

the insurers had previously specifically reserved the defense but never asserted it.

From those facts, the court held that a reasonable jury could find the insurers

---

[6] As Grumman notes (AOB82), the district court suggested that waiver requires proof of prejudice in observing that "inaction alone" will constitute waiver only when "the insured has been prejudiced."  SA__[DE372_22].  The error is semantic at most.  To be precise, prejudice applies to estoppel, not to waiver, *see Allstate Ins. Co. v. Gross*, 27 N.Y.2d 263, 269 (1970), although the concepts are sometimes used interchangeably, *see Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002).  The district court's *substantive* point, however, is entirely correct:  "inaction alone" is insufficient to prove waiver, as *KeySpan* holds.

"manifested an intent" not to assert a late notice defense. 988 N.Y.S.2d at 171-72.

Grumman does not and cannot identify any such facts here. Rather, the only evidence indicates that Century had not even analyzed the claim before this coverage litigation because it had not located the alleged primary policies. Indeed, Grumman's own broker denied that Century had ever made a coverage decision, and expressly stated that the claim was still under consideration by Century's management. JA__[DE436_Calland_Ex.3_358–59]; *see also* JA__[DE436_Calland_Ex.21_115, 123]. Grumman thus can argue waiver based solely on the passage of time alone, and *KeySpan* explicitly holds that waiver cannot be inferred "simply as a result of the passage of time." *Keyspan*, 23 N.Y.3d at 590.

## II. THE DISTRICT COURT CORRECTLY GRANTED CENTURY SUMMARY JUDGMENT AS TO THE PARK-RELATED COSTS

The district court also correctly held that Grumman forfeited coverage of both the costs related to NYSDEC's actions at Bethpage Community Park and Oyster Bay's April 2005 suit related to the Park because Grumman failed to give timely notice of both the relevant occurrence and claims. As shown above, it is undisputed both that Grumman knew the soil at the Park was polluted by July 2002 and that NYSDEC sent Grumman a notice of responsibility in July 2002 referring to the contamination at the Park as ███████████████████████

JA__[DE388_Heskin_Ex.55_759]. Oyster Bay then advised Grumman, in

53

December 2002, that it intended to hold Grumman liable for that contamination.

JA__[DE388_Heskin_Ex.59].  Oyster Bay ultimately sued Grumman on April 21,

2005.

Grumman did not notify Century of a claim or an occurrence at the Park

until June 14, 2005—almost three years after Grumman was aware both that it had

contaminated the Park and that NYSDEC was investigating its responsibility.  As

the district court held, Grumman's notice came three years too late.

SA__[DE554_12-13].

### A.  Grumman Failed To Give Timely Notice Of The Accident Or Occurrence At The Park, Which Was Known To Grumman By At Least 2002

Grumman does not deny that it was aware no later than 2002 that it was

responsible for contaminating the soil at the Park.  *See supra* at 16.  Grumman's

only response to its failure to provide notice at that time is that it had *already done*

*so* by including the 1983 PRP Letter among the materials provided in the 1984 Old

Bethpage Landfill update package.  AOB87-88.  As set out above, there are

multiple reasons that package was insufficient to provide notice of *any* new claim

or occurrence.  *See supra* at 40-46.  Even beyond those problems, the package

certainly did not constitute notice of a claim or occurrence *at the Park* that gave

rise to NYSDEC's 2002 investigation or Oyster Bay's 2002 claim and 2005 suit.

First, Grumman conceded below that it "did not know about groundwater

contamination at the" Park until the 2000s. SA__[DE372_18]. Grumman cannot have given "notice of an occurrence or of a claim unless it understood one had occurred or was being made." SA__[DE372_20]. Grumman says an insured need not give notice of all *damage* resulting from a given occurrence (AOB33), but the Park contamination was not additional damage resulting from TCE spills at the Facility—Park contamination resulted from the entirely different act of intentionally pouring wastewater directly into the soil at what became the Park. *See supra* at 16.

Second, the 1983 PRP Letter included in the Landfill package related to "Site 130003," and NYSDEC itself has confirmed that site 130003 as defined in 1983 ███████████████████████████████████████████████ ████████████████████████████.[7]  Grumman nevertheless says the Letter tacitly encompassed the Park because it referred to contamination at site 130003 and "its environs." AOB88. But that vague reference did not give notice of contamination *at the Park in particular*, especially because the letter itself did not identify any actual damage or contamination at any nearby site. In *Reynolds Metal Co. v. Aetna*

---

[7] Indeed, before summary judgment briefing in this case, Grumman itself referred to NYSDEC's actions at the Facility and at the Park as separate and distinct "suits" or "claims," ███████████████████████ and in its cross-claims in this action, JA__[DE11_33-34]_¶13. Grumman makes no effort to explain or justify its about-face.

*Casualty & Surety Co.*, 696 N.Y.S.2d 563 (3d Dep't 1999), the New York

Appellate Division held that identical language in a PRP letter was insufficient to

constitute a claim with respect to a river that was immediately adjacent to the

referenced site. *Id.* at 565, 567. The same is true here.

Third, even if Grumman's 1984 letter somehow constituted notice of the

*occurrence* at the Park, Grumman separately failed to provide prompt notice of

Oyster Bay's 2002 *claim*, which independently bars coverage of costs related to

that claim. Grumman argues that Oyster Bay's 2002 intent-to-sue letter related to

a different "claim" than the CERLCA claim it brought in 2005 because in 2002

Oyster Bay threatened to hold Grumman liable under RCRA. AOB88-89. For

purposes of an insurance liability policy, however, a "claim" is merely "an

assertion by a third party that in the opinion of that party the insured may be liable

to it for damages." *Fairchild*, 56 F.3d at 439. Oyster Bay made exactly that

assertion in 2002, and Grumman said nothing to Century. Grumman cites no

precedent holding that a third party's "claim" becomes a different "claim" merely

because the party revises its legal theory. Grumman unambiguously knew in 2002

that Oyster Bay was asserting Century's liability to Oyster Bay, whether under

RCRA, *see*, *e.g.*, *Lindsay Mfg. Co. v. Hartford Accident & Indem. Co.*, 118 F.3d

1263, 1270-71 (8th Cir. 1997) (RCRA claim covered by CGL policy), or some

other legal basis for liability. Grumman accordingly is precluded from recovering

any costs related to the Park, including those related to NYSDEC's investigation and Oyster Bay's 2005 CERCLA suit.

## B. Grumman's Notice Of Oyster Bay's Suit Was Unreasonably Late As A Matter of Law

The district court also properly held, in the alternative, that Grumman's nearly two-month delay in providing Century notice of Oyster Bay's actual suit after it was filed was unreasonably late as a matter of law. SA__[DE553_16-17]. Grumman makes no attempt to excuse that delay. Grumman argues only that

█████████████████████████████████████████████████████

███████████████████ AOB89. Again, that argument merely asserts that Grumman's unexplained delay did not prejudice Century, and lack of prejudice to the insurer does not excuse late notice. *See supra* at 47-48.

## C. Century Did Not Waive Its Late Notice Defense With Respect To Oyster Bay's Claim

Grumman argues that Century waived its right to disclaim on late-notice grounds because Century knew that Grumman had provided notice of Oyster Bay's Complaint six weeks after its receipt, but did not assert the defense until this coverage litigation. AOB90. Grumman's factual premise is wrong—it was not until this litigation began that Century became aware of the facts indicating Grumman should have provided notice of the *occurrence* in 2002. Grumman is also wrong on the law—as already shown, mere delay in asserting a known

57

defense does not constitute waiver, *see supra* at 51, and Grumman cites nothing

other than alleged delay as the basis for its waiver argument.

## III. THE DISTRICT COURT CORRECTLY HELD THAT THERE IS NO COVERAGE FOR THE WATER DISTRICT CLAIMS

The district court correctly rejected Grumman's argument for coverage of

the Water Districts' claims because Grumman did not provide notice of those

claims—which were first made in 2000 and 2001—until 2009 at the earliest.

Grumman does not dispute that it met repeatedly with the Water Districts in

2000 and 2001, and that the Water Districts made clear they sought to hold

Grumman financially responsible for the groundwater contamination that all

parties knew was on its way to their wells. Indeed, Grumman had already

estimated by 2000 that the very remedial measures the Water Districts later

demanded could cost ██████████ [8]

Further, on February 2, 2001, Grumman promised each of the Water

Districts that for impacted wells the "costs for well head treatment would be borne

by Northrop Grumman/Navy for the time period that the treatment is required,

---

[8] 

58

whether this be more or less than 30 years." JA__[DE359_Hultman_Ex.35_913].

That is, Grumman had not only been told that it was required to spend money to

protect the Water Districts' wells, Grumman had already *agreed to pay* the claimed

costs. Grumman's contention that the Water Districts never made the very claim

Grumman promised to satisfy is baffling.

Grumman also argues that the Water Districts' demands did not qualify as

"claims" because the Water Districts were merely "participating in NYSDEC's

administrative action against Grumman in an attempt to influence its outcome."

AOB91. That contention is both irrelevant and wrong.

The argument is irrelevant because the occurrence from which the Water

District claims arose was TCE contamination at the Bethpage Facility that

eventually seeped into the water supply. Grumman's notice of that occurrence was

*decades* late, as already explained, regardless whether its notice of the later Water

Districts' claim was timely.

Grumman's argument is also wrong. Grumman concedes that a "claim"

exists when a third party asserts a violation of its "own rights" and that the insured

may be liable "to it" for damages. AOB91. The Water Districts did exactly that:

they asserted that their own water supplies were threatened by Grumman's actions

and demanded that Grumman undertake expensive remedial efforts required by

law, which Grumman agreed to undertake.

59

It is of no legal consequence that the Water Districts were, at the time, seeking to require Grumman to make payments through the NYSDEC administrative process rather than asserting their own individual suits against Grumman. A "claim may be made without the institution of a formal proceeding"—all that is required is "an assertion by a third party that in the opinion of that party the insured may be liable to it for damages." *Fairchild*, 56 F.3d at 439. By seeking to enforce their rights through NYSDEC's administrative action, the Water Districts were unambiguously asserting their opinion that Grumman was liable to them for the costs of remediating their wells, and yet Grumman waited some eight years before providing notice to Century. *See supra* at 18-19.

None of the cases cited by Grumman supports its argument that the Water Districts did not make a "claim" by asserting their own rights through the NYSDEC's action. The first simply holds that "an accusation that wrongdoing occurred is not by itself a claim" when it is unaccompanied by a specific allegation of known damage and a request for relief. *Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co.*, 146 F.3d 131, 134 (2d Cir. 1998). The Water Districts here did allege specific damage and specific action by Grumman. Grumman's other case simply confirms that a third party must assert its *own rights* to make a "claim." *Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215-

60

16 (2d Cir. 1999). The Water Districts did exactly that in the NYSDEC proceeding.

Finally, ███████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████████████
███████████████████████ Notice with respect to claims by AWD and SFWD is thus indisputably late as a matter of law.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

*/s/ Jonathan D. Hacker*

SHANE R. HESKIN
ROBERT F. WALSH
WHITE AND WILLIAMS LLP
1650 Market Street, Suite 1800
Philadelphia, Pennsylvania 19103
(215) 864-7000
Email:
heskins@whiteandwilliams.com

JONATHAN D. HACKER
BRADLEY N. GARCIA
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: jhacker@omm.com

Dated: April 22, 2016

*Attorneys for Defendant-Cross-Defendant-Appellee*
*Century Indemnity Company*

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,604 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated:  April 22, 2016                    Respectfully submitted,


                                         */s/ Jonathan D. Hacker*
                                         JONATHAN D. HACKER
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street, N.W.
                                         Washington, D.C. 20006
                                         Telephone: (202) 383-5300
                                         Facsimile: (202) 383-5414
                                         E-mail: jhacker@omm.com